## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| Amanda Bazzett, on behalf of herself and all others similarly situated,<br><br>       Plaintiff,<br><br>    vs.<br><br>The Wendy's Company, Quality Is Our Recipe, LLC, and YCD Enterprises II, LLC, and ABC Corporations 1-217 d/b/a Wendy's,<br><br>       Defendants. | Civil Action No.: **2:24-cv-412**<br><br><br><br>**COMPLAINT – COLLECTIVE ACTION**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Amanda Bazzett, by and through her attorneys, on behalf of herself and others similarly situated, based on personal knowledge with respect to her own circumstances and based upon information and belief pursuant to the investigation of counsel as to all other allegations, alleges the following:

## I. INTRODUCTION

1.      "Despite the health benefits of breastfeeding for both mothers and infants, too many nursing employees face obstacles to pumping breast milk in the workplace, making it difficult to continue breastfeeding while employed. Break time and a private space to express breast milk are critical [] supports for breastfeeding employees."[1] The House of Representatives reached these conclusions in 2021, after more than a decade of considering the plight of working mothers around the country. Since 2010, the Fair Labor Standards Act of 1938 ("FLSA") has required employers

---

[1] H.R. Rep. 117-102, at 3 (2021), *available at* https://www.congress.gov/117/crpt/hrpt102/ CRPT-117hrpt102.pdf.

to provide nursing accommodations, but "[g]aps in the law limit access to [its] protections and le[ft] employees unable to recover in court when their employers fail to comply with the law's requirements."[2] Therefore, on December 29, 2022, Congress passed and the President signed the Providing Urgent Maternal Protections for Nursing Mothers Act (the "PUMP Act") to extend the FLSA protections "to more employees and ensure employees can recover appropriate forms of relief in court when employers violate the law."[3]

2.    Despite already being required to comply with the FLSA breastfeeding requirements for more than a decade, after the PUMP Act came into effect, The Wendy's Company, and Quality is Our Recipe, LLC (collectively, the "Wendy's Defendants"), along with YCD Enterprises II, LLC ("YCD") and ABC Corporations 1-217 d/b/a Wendy's, (collectively with YCD the "Wendy's Franchisee Defendants" and collectively, with YCD and the Wendy's Defendants, the "Defendants") fail to provide a "reasonable break time for an employee to express breast milk" and fail to provide a "place…that is shielded from view and free from intrusion from coworkers and the public, which may be used by an employee to express breast milk," all of which is mandated by the PUMP Act. Instead, employees are forced to pump breast milk in unsanitary stock rooms, bathrooms, or their private vehicles. Defendants' failure to provide sufficient lactation accommodations is a systemic issue that has impacted employees at locations throughout the country.

3.    Given this nationwide issue, Plaintiff brings this collective action lawsuit against Defendants to seek a remedy that requires Defendants to comply with the law.

---

[2] *Id.*

[3] *Id.*

4.      It has long been known that breastfeeding is crucial for a newborn baby and has numerous benefits for the mother and the child. The American Academy of Pediatrics recommends breastfeeding exclusively for at least the first six months after birth and, ideally, until or after the child is twelve months of age.[4] Breast milk is an organic superfood that provides the essential nutrients and antibodies required for a baby's healthy growth and development. It can reduce the risk of various illnesses and infections and strengthen the infant's emotional and psychological development. Breastfeeding also has mental and physical benefits for the mother and for society at large.

5.      Not providing supportive accommodations for nursing mothers can have a negative impact on their physical, mental, and emotional health. Mothers unable to pump breast milk can experience engorgement, which can be painful and lead to infection. They also produce less milk for their babies. Not having sufficient time or space to pump can also result in increased feelings of stress, anxiety, and guilt for not being able to provide their babies with the best possible nutrition. Studies show that mothers who did not have access to a private place to pump breast milk were less likely to continue breastfeeding and achieve their breastfeeding goals, which increases their risk of mental health conditions like anxiety, postpartum depression, and stress.

6.      To ensure that employers provide reasonable break times and a private, non-bathroom, space for breastfeeding employees to pump at work, Congress passed the Break Time for Nursing Mothers law (the "Pumping at Work Act") in 2010, which is the statute that amended the FLSA to require such accommodations. Unfortunately, since it covered only non-exempt

---

[4] Along with the World Health Organization, the U.S. Surgeon General's Office, and the American Academy of Family Physicians. *See* the Office of Personnel Management, *Guide for Establishing a Federal Nursing Mother's Program* (January 2013), at 2. Available at: https://www.opm.gov/policy-data-oversight/worklife/news/2013/1/opm-publishes-new-guide-for-establishing-a-federal-nursing-mother-s-program/ (last accessed April 11, 2023).

employees and with a weak enforcement mechanism, the law was "virtually useless in almost all practical application[s]."[5] The 2022 PUMP Act corrected this defect by providing additional forms of relief for those harmed by their employer's failure to provide adequate time and space for nursing parents to pump. *See* 29 U.S.C. §§ 216(b) and 218d.

7.      Plaintiff Amanda Bazzett was an employee of Defendants. She worked at the Wendy's restaurant at 100 Florida Road in Adel, Georgia. She commenced employment in August 2022 and gave birth to her child in March 2023. When she returned to work in or about June 2023, she requested a private space to pump milk, but Defendants refused to provide one. In this way, Defendants deprived her of her rights as a nursing mother guaranteed by the PUMP Act to a clean and secure space to pump milk for her infant child. She was forced to pump in the "crew room," an open room at the back of the restaurant for employees to take breaks, eat meals and store personal belongings. Ms. Bazzett would cover herself with an apron and pump while other crew members would frequently come in and out. Defendants failed to provide her with a secure, private space and reasonable breaks to pump.

8.      As a result of the foregoing, Ms. Bazzett experienced a reduction in her milk supply for her new baby. This reduction and the lack of accommodation provided by Defendants have caused Ms. Bazzett to experience embarrassment, anguish, personal hardship, anxiety, humiliation, and emotional distress.

9.      It would be relatively easy for Defendants to comply with the PUMP Act. For example, there are numerous pre-fabricated temporary spaces that are commercially available for installation. These temporary spaces are easy to set up, affordable, and would satisfy Defendants'

---

[5] *Hicks v. City of Tuscaloosa*, No. 13-cv-02063, 2015 U.S. Dist. LEXIS 141649, at *99 (N.D. Ala. Oct. 19, 2015).

obligations under the PUMP Act. Examples of the spaces are those sold by Mamava,[6] Brighter Booth[7], and DayOne Baby[8], among many others. Images from those companies' websites show how such spaces could have been integrated into Defendants' space:



10.     Likewise, other companies are working to accommodate breastfeeding mothers with different easy to implement options, such as dedicating a room to breastfeeding in a public stadium[9] or permitting employees to use restaurant managers' locked offices to express milk.[10] Thus, while there are many ways to accommodate breastfeeding employees, Defendants have simply decided to not provide such accommodations.

11.     Defendants' failure to comply with the PUMP Act has significantly impacted Ms. Bazzett and other breastfeeding employees of Defendants. Instead of supporting breastfeeding

---

[6] https://www.mamava.com

[7] https://brighterbooth.com

[8] https://www.dayonebaby.com

[9]  *See*  https://wvutoday.wvu.edu/stories/2023/09/07/new-dedicated-lactation-room-opens-to-the-public-at-milan-puskar-stadium (last accessed October 2, 2023).

[10]  *See*  https://www.qsrmagazine.com/outside-insights/ask-restaurant-legal-professionals-how-accommodate-pregnant-and-breastfeeding (last accessed October 2, 2023).

mothers, Defendants' practices forced those mothers into a Hobson's choice between using demeaning, unsanitary spaces to express milk, abandoning pumping at work altogether, or quitting their jobs. Congress clearly declared in the PUMP Act that no mother should have to make such a choice.

12.     Plaintiff seeks redress for Defendants' violations of the PUMP Act by, *inter alia*, requiring Defendants to provide sufficient break time and a functional place, shielded from view and free from intrusion, which an employee may use to express breast milk.

13.     Plaintiff brings a nationwide collective action on behalf of employees at Wendy's restaurants across the country who were victims of Defendants' violations of the PUMP Act.

14.     Defendants have intentionally, willfully, and repeatedly harmed Plaintiff and members of the Collectives (to be defined below) by refusing to provide accommodations that they know they are obligated to provide under the PUMP Act.

15.     At all relevant times, the Wendy's Defendants controlled its franchisees' operations, including the Wendy's Franchisee Defendants. Indeed, in Wendy's recent Annual Report, it states:

> Wendy's strives to maintain quality and uniformity throughout all restaurants by . . . continual in-service training of employees, restaurant operational audits and field visits from Wendy's supervisors. In the case of franchisees, field visits are made by Wendy's personnel who review operations . . . and make recommendations to assist in compliance with Wendy's specifications.[11]

---

[11] Wendy's Annual Report for the fiscal year ending January 2, 2022. Available at: https://d18rn0p25nwr6d.cloudfront.net/CIK-0000030697/6483abe6-765e-4052-a4a0-6b3b01480410.pdf

16.     Plaintiff and the Collectives (defined below) would benefit from the issuance of a court-supervised notice of the present lawsuit and allowed to opt into this action, pursuant to § 216(b) of the FLSA.

## II. **PARTIES**

17.     Plaintiff Amanda Bazzett was an employee of YCD and the Wendy's Defendants who worked as a Crew Member at the Wendy's-branded restaurant located at 100 Florida Road in Adel, Georgia. Ms. Bazzett is an individual resident of Adel, Georgia, and a citizen of Georgia. During all relevant times, Ms. Bazzett was the mother of an infant whom she breastfed and continued to breastfeed while Ms. Bazzett was working for YCD and the Wendy's Defendants. Pursuant to § 216(b), she has consented in writing to be a party to this action. Her executed Consent to Join form is filed herewith.

18.     The members of the Wendy's Collective and Wendy's Franchisee Collective, including Ms. Bazzett, are or have been employed by Defendants since December 29, 2022 and have requested lactation accommodation. Upon information and belief, Defendants' practices and policies, or lack thereof, have impacted members of the Wendys Collective and Wendy's Franchisee Collective in the same or a similar manner across Defendants' locations.

19.     Defendant The Wendy's Company is a holding company for fast food chain Wendy's. It is a Delaware corporation with a principal place of business located at One Dave Thomas Boulevard, Dublin, Ohio 43017 and is a citizen of the State of Ohio. As of January 1, 2023, there were 5,994 Wendy's restaurants in the U.S., including 403 owned by the Wendy's

Defendants and 5,591 operated by 217 franchisees.[12] In 2022, approximately 53% of Crew Members and 68% of restaurant management were female.[13]

20.     Quality Is Our Recipe, LLC ("Quality") is the owner and franchisor of the Wendy's restaurant system in the U.S. It is a Delaware limited liability company formed in April 2015. It does business under the names of "Wendy's" and "Wendy's Old Fashioned Hamburgers." Quality's principal place of business is located at One Dave Thomas Boulevard, Dublin, Ohio 43017.

21.     Quality is owned by Wendy's International, LLC, which is wholly owned by Wendy's Restaurants, LLC, which is wholly owned by Defendant The Wendy's Company. The Wendy's Company is a citizen of the State of Ohio. Therefore, Quality is a citizen of the State of Ohio.

22.     Defendant YCD Enterprises II, LLC is a Georgia limited liability company with a principal place of business located at 2801 Wicklow Street, Savannah, Georgia, 31404. YCD is a franchisee of the Wendy's Defendants and is listed as the owner of the restaurant at 100 Florida Road in Adel, Georgia (the "Restaurant"). YCD is the franchisee of the Wendy's restaurant location at which Ms. Bazzett worked at all relevant times herein. YCD is a citizen of the State of Georgia.

23.     Defendants ABC Corporations 1-217 d/b/a Wendy's (the "ABC Corporations") are fictitiously named entities that represent the franchisees of the Wendy's Defendants and owners

---

[12] The Wendy's Company Form 10-k (Jan. 1, 2023) *at* https://d18rn0p25nwr6d.cloudfront.net/CIK-0000030697/00807ba9-3d2b-4ea9-839c-6c063a2df236.pdf

[13]     Wendy's     2022     Corporate     Responsibility     Report.     Available     at: https://www.wendys.com/sites/default/files/2023-05/Wendys-2022-Corporate-Responsibility-Report.pdf (last accessed October 2, 2023).

of Wendy's-branded restaurants throughout the United States at which members of the Wendy's Franchisee Collective worked at all relevant times herein.

24.     Defendants were "employers" within the meaning of the FLSA pursuant to 29 U.S.C. §§ 203(a), (d) and Defendants YCD and the Wendy's Defendants were "employers" of Ms. Bazzett at all times relevant hereto. At all times relevant and material herein, and as alleged further herein, the Wendy's Defendants controlled the operations of its franchisees, including the Wendy's Franchisee Defendants, and had a centralized policy making system whereby the physical layout of the restaurants, policies, practices, and guidelines, including with respect to lactation accommodations, are created and disseminated to its franchise-owned and Company-owned restaurants from its headquarters in Ohio.

### III. JURISDICTION AND VENUE

25.     This Court has jurisdiction over this matter pursuant to 29 U.S.C. § 216(b) and 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States.

26.     This Court has personal jurisdiction over Defendants because Defendant Wendy's Company is headquartered in this District, Defendant Quality is a citizen of this District, the Wendy's Defendants transact business in this District, and Defendants have minimum contacts with this District, including that the Wendy's Franchisee Defendants have each entered into franchisee contracts with one or more of the Wendy's Defendants, and agreed, pursuant to the Franchise Agreement with the Wendy's Defendant, to be subject to personal jurisdiction in this District.

27.     Venue in this Court is proper under 28 U.S.C. § 1391(b) because a substantial part of the acts or omissions giving rise to the claims alleged herein occurred within this District, and Defendants are subject to personal jurisdiction here.

# IV. BACKGROUND

### A. The Benefits of Breastfeeding

28.     There are significant and proven benefits to breastfeeding children. Breast milk is widely accepted as the optimal source of nutrition for infants, and it provides numerous protections against illnesses and diseases for infants and mothers alike.[14]

29.     Breastfed babies generally have better immune system development and functioning because breastmilk contains antibodies that protect developing immune systems from disease.[15] As a result, babies who are breastfed tend to have fewer and less severe instances of certain short-term illnesses, including bacterial meningitis, diarrhea, ear infections, respiratory infections, urinary tract infections, and certain chronic illnesses, including diabetes, lymphoma, leukemia, hypercholesterolemia, and asthma.[16]

30.     A paper published in 2015, analyzing dozens of studies, found that breastfeeding is associated with a lower risk of childhood obesity. The paper states that breastfeeding was associated with a significantly reduced risk of obesity in children.[17]

---

[14] Am. Acad. of Pediatrics. *Technical Report: Breastfeeding and the Use of Human Milk*. Pediatrics. 2022;150 (1): e2022057988. Available at: https://publications.aap.org/pediatrics/article/150/1/e2022057989/188348/Technical-Report-Breastfeeding-and-the-Use-of?searchresult=1 (last accessed April 13, 2023).

[15] *See* Spitzmeuller, C.*,* Wange, Z., Zhang, J., Thomas, C.L., Fisher, G.G., Matthews, R.A., and Strathearn, L. (2016) *Got milk? Workplace factors related to breastfeeding among working mothers*, Journal of Organizational Behavior, J. Organiz. Behav. 37, 692–718 ; Grummer-Strawn, L.M. and Rollins, N. (2015), Summarizing the health effects of breastfeeding. Acta Paediatr, 104: 1-2. https://doi.org/10.1111/apa.13136.

[16] *See supra,* n. 8.

[17] Horta, B.L., Loret de Mola, C. and Victora, C.G., *Long-term consequences of breastfeeding on cholesterol, obesity, systolic blood pressure and type 2 diabetes: a systematic review and meta-analysis*. Acta Paediatr, (2015) 104: 30-37; *see also* Yan J., Liu L., Zhu Y., Huang G., Wang P.P., *The association between breastfeeding and childhood obesity: a meta-analysis.* BMC Public Health. 2014, available at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4301835/.

31.     Several studies have found that breastfeeding is associated with a lower risk of sudden infant death syndrome ("SIDS"). These studies show that babies who were breastfed for the first few months of life had a lower risk of SIDS than babies who were not breastfed.[18]

32.     The World Health Organization recommends that infants be exclusively breastfed for the first six months of life, meaning they should receive no other food or drink, not even water.[19]

33.     Although breastfeeding initiation and duration have consistently improved, one study revealed that 60% of women do not meet their breastfeeding goals.[20]

34.     Society also benefits from breastfeeding. One study showed that if 90% of women in the United States breastfed exclusively for six months, it would save the country $13 billion and prevent 911 preventable infant deaths per year.[21]

---

Wang Y., Zhang J., Li Y., et al.., *Breastfeeding and childhood obesity: a systematic review and meta-analysis*. JAMA Pediatr. (2016); 170(8):740–746.

[18] Thompson JMD, Tanabe K, Moon RY, Mitchell EA, McGarvey C, Tappin D, Blair PS, Hauck FR. *Duration of Breastfeeding and Risk of SIDS: An Individual Participant Data Meta-analysis*. Pediatrics. 2017 Nov;140(5): e20171324. Available at: https://pubmed.ncbi.nlm.nih.gov/29084835/ (last accessed September 22, 2023); *see also* Meek, J. Y., Noble, L. *Technical Report: Breastfeeding and the Use of Human Milk.* Pediatrics July 2022; 150 (1): e2022057989, at 7. Available at: https://publications.aap.org/pediatrics/article/150/1/e2022057989/188348/Technical-Report-Breastfeeding-and-the-Use-of?searchresult=1?autologincheck=redirected (last accessed September 22, 2023).

[19] *World Health Organization's (WHO) Global Strategy for Infant and Young Child Feeding*, at 7–8. Available at: https://www.who.int/publications/i/item/9241562218 (last accessed September 22, 2023).

[20] Odom E. C., Li R., Scanlon K. S., Perrine C. G., Grummer-Strawn L., *Reasons for earlier than desired cessation of breastfeeding*. Pediatrics (2013); 131:e726–e732, e729.

[21] Morris, L., Lee, J., Williams, J., *Exposed: Discrimination Against Breastfeeding Workers*. WorkLife Law, at 7. Available at: https://worklifelaw.org/publication/exposed-discrimination-against-breastfeeding-workers/ (last accessed on May 11, 2023) (citing Bartick, M. L., & Reinhold, J. *The economic burden of suboptimal breastfeeding in the United States: a systematic review*. Pediatrics (2010); 126(3), e756–e768).

35.     As discussed, the benefits of breastfeeding are significant, but there are also drawbacks to not breastfeeding. Parents who do not breastfeed suffer heightened health risks "including breast and ovarian cancers, heart disease, postpartum depression, diabetes, and rheumatoid arthritis."[22]

### B.     Proper Workplace Accommodations for Pumping Are Critical

36.     Not having a secure space for nursing mothers can increase anxiety and feelings of being overwhelmed, which can have a negative impact on the mother's mental, physical, and emotional health. Nursing mothers who do not have adequate workplace support are at an increased risk of early weaning, illness, and job loss. Therefore, it is critical for workplaces to provide support for nursing mothers.

37.     In 2011, the U.S. Surgeon General released a Call to Action to Support Breastfeeding and noted that for employed mothers, "returning to work is a significant barrier to breastfeeding" because nursing mothers often face inflexibility and, among other things, lack a private place to express milk.[23] The Call to Action found that when mothers "do not have a place to breastfeed or express breast milk, they may resort to using the restroom for these purposes, an approach that is unhygienic and associated with premature weaning."[24]

38.     A study based on data from 2011 to 2013, after the Pumping at Work Act was enacted in 2010, found that workplace accommodations are a significant predictor of breastfeeding

---

[22] *Exposed: Discrimination Against Breastfeeding Workers*, s*upra* note 20, at 7, citing Am. Acad. of Pediatrics, Policy Statement, *Breastfeeding and the Use of Human Milk*, 129 PEDIATRICS e827, 32 (2012).

[23] *The Surgeon General's Call to Action to Support Breastfeeding, Barriers to Breastfeeding in the United States*, Office of the Surgeon General (US); 2011. Available at https://www.ncbi.nlm.nih.gov/books/NBK52682/ (last accessed September 22, 2023).

[24] *Id.*

duration.[25] The study found that nearly 50% of women reported that their postpartum employment plans affected breastfeeding-related decisions.[26] About a third of women indicated that employment posed a challenge to breastfeeding, and only 45% of women had access to a private space to pump milk.[27]

39.     A clean and secure lactation space is necessary for a mother to pump milk comfortably and efficiently.[28] Without a clean, secure space, nursing mothers can experience anxiety and stress, which can negatively impact the mother's milk supply.

40.      The more a mother gets to pump her breast milk, the longer her milk supply/production lasts and the more breast milk the baby gets. Continuous pumping increases the chances of a longer supply of breastmilk.[29] Conversely, being unable to express milk when needed can result in a decrease in the individual's milk supply, forcing an earlier-than-recommended weaning of the child.[30]

---

[25] Kozhimannil, K. B., Jou, J., Gjerdingen, D. K., and McGovern, P. M., *Access to workplace accommodations to support breastfeeding after passage of the Affordable Care Act*, Women's Health Issues. 2016; 26(1): 6–13.

[26] *Id.*, at 8.

[27] *Id.*

[28] Whitley M.D., Ro A., Choi B. *Workplace breastfeeding support and job satisfaction among working mothers in the United States*. Am J Ind Med. 2019; 62(8):716–726, 717. Available at: https://pubmed.ncbi.nlm.nih.gov/31168846/ (last accessed September 26, 2023)

[29] *See* Bai Y., Wunderlich S.M. *Lactation accommodation in the workplace and duration of exclusive breastfeeding*. J Midwifery Women's Health. 2013; 58(6): 690–96, 697 and 695.

[30] Barriers to Breastfeeding in the United States, *Surgeon General's Call to Action to Support Breastfeeding, Barriers to Breastfeeding in the United States*, Office of the Surgeon General (US); 2011. Available at https://www.ncbi.nlm.nih.gov/books/NBK52688/ (last accessed September 22, 2023).

41.     When a mother's milk empties, there are neurological signals that release a hormone called prolactin, which triggers milk production. Limiting the amount a mother can pump decreases the amount of emptying and, therefore, decreases milk production.

42.     Limiting the amount a person can pump can also lead to mastitis, an inflammation of the breast tissue that may involve infection, abscess, pain, fever, and illness.[31] Mastitis can increase the risk of premature weaning.[32] Even if women do not develop mastitis or other complications from engorgement, pumping while already engorged can cause nipple trauma and bruising. Additionally, inadequate pumping can reduce a mother's milk supply, and it can take much longer to bring the supply back up.[33]

43.     Moreover, a recent systematic review of studies on maternal mental health and breastfeeding showed that mothers who were not able to achieve their breastfeeding goals had negative mental health outcomes and put them at greater risk for depression, anxiety, and other mental health conditions.[34] Having proper workplace accommodations, like a clean and secure place to pump milk, can help nursing mothers achieve their breastfeeding goals and minimize the risk of maternal mental health problems, such as depression and anxiety. Nursing mothers who

---

[31] *Exposed: Discrimination Against Breastfeeding Workers*, s*upra* note 20 at 7, citing Lisa Amir. & The Academy of Breastfeeding Medicine Protocol Committee, ABM Clinical Protocol #4: Mastitis, Breastfeeding Medicine, 9 (5), 239 (Revised March 2014).

[32] *See The Surgeon General's Call to Action to Support Breastfeeding, Barriers to Breastfeeding in the United States*, *supra* n. 22.

[33] *Id.*

[34] Yuen M., Hall O.J., Masters G.A., Nephew B.C., Carr C., Leung K., Griffen A., McIntyre L., Byatt N., Moore Simas T.A. *The Effects of Breastfeeding on Maternal Mental Health: A Systematic Review*. J Womens Health (Larchmt). 31(6): 787–807.

had access to supportive workplace accommodations can feel more confident and supported in the breastfeeding experience, which can play an important role in maternal mental health.[35]

### C.      *Employers Must Do More to Protect Breastfeeding Employees*

44.      Failing to provide adequate lactation accommodations remains a prevalent issue and can often force nursing mothers to stop breastfeeding or leave the workplace altogether.

45.      A report published in 2016 by the Center for WorkLife Law at the UC Hastings College of the Law found that cases where an employer denied accommodations to or discriminated against an employee because she was breastfeeding or needed to express milk during the workday increased 800% between 2005 and 2016.[36]

46.      According to a report released in 2019, which tracked 70 cases involving allegations of breastfeeding discrimination and retaliation that have written opinions issued between 2008 and April 2018, 63% of employees ended up losing their job (43% were fired and 20% resigned).[37]

47.      The women facing job loss for lack of lactation accommodation spanned from a taqueria cashier in California to a doctor in Georgia and a lawyer in New York.[38]

---

[35] *See The Surgeon General's Call to Action to Support Breastfeeding, Barriers to Breastfeeding in the United States*, *supra* n. 22.

[36] Calvert, C. T., *Caregivers in the Workplace: FRD Update 2016*. Center for WorkLife Law at the UC Hastings College of the Law, at 17. Available at: https://worklifelaw.org/publications/Caregivers-in-the-Workplace-FRD-update-2016.pdf (last accessed May 10, 2023).

[37] *Exposed: Discrimination Against Breastfeeding Workers, supra* note 20, at 13.

[38] *Id.* citing *Dep't of Fair Employment & Hous. v. Acosta Tacos*, No. E200708 T-0097-00se, 2009 CAFEHC LEXIS 2, at *8–10 (Cal. Fair Employment & Hous. Comm'n June 16, 2009); *Wexler v. Kennesaw Pediatrics, P.C.*, No. 16-cv-1491, 2017 U.S. Dist. LEXIS 111037, at *2–3 (N.D. Ga. July 17, 2017); *Kim v. Goldberg*, 862 F. Supp. 2d 311, 315 (S.D.N.Y. 2012).

48.     For example, in 2019, Simone Teagle filed a lawsuit against the City of New York

for the discrimination she experienced as a breastfeeding mother.[39] Teagle said that for nearly six

months, she was forced to pump in a breakroom, a bathroom, the locker room, or her vehicle.[40] As

a result, she "lost a lot of her milk supply."[41] The suit is still pending.

### D.     *The Law Before the PUMP Act*

49.     Despite this wide consensus in favor of pumping, and Congress having passed the

Pumping at Work Act in 2010, for the past 12 years, a common problem faced by all nursing

mothers who were not provided with sufficient lactation accommodation was the weak

enforcement mechanism under the Pumping at Work Act. With limited remedies available, many

of the claims in these cases based on violations of the Pumping at Work Act were dismissed.

50.     Under § 207(r) of the Pumping at Work Act, the only remedies available were for

unpaid minimum wages or overtime compensation. However, because employers are not required

to pay employees who take breaks to pump, holding accountable employers who failed to provide

---

[39] *See Teagle et al. v. The City of New York et* al., No. 19-cv-7211 (E.D.N.Y); *see also* H.R. 3110, 117th Cong. (1st Sess. 2021), at 16.

[40] *See NYPD Cop Sues City for $5 Million Amid Claims She Was Harassed for Pumping Breast Milk*, (October 18, 2018). Available at: https://news.yahoo.com/nypd-cop-sues-city-5-155315818.html (last accessed April 12, 2023).

[41] *Exposed: Discrimination Against Breastfeeding Workers, supra* note 20, at 12.

accommodations was virtually impossible.[42] As one court noted, with regards to the Pumping at Work Act, "there does not appear to be a manner of enforcing the express breast milk provisions."[43]

51.     Without a proper enforcement mechanism, employers like Defendants were permitted to, and did, freely violate the Pumping at Work Act with little fear of consequence.

52.     Ensuring that working mothers have the time and space to express breastmilk is not a partisan issue. Around the time that the PUMP Act was passed, politicians from across the political spectrum expressed support for strengthening protections for lactating mothers in the workplace.

53.     In a statement issued on March 8, 2021, in recognition of International Women's Day, President Biden said: "We must ensure that women can access affordable, high-quality health care throughout their lives, including maternal health care and the ability to breastfeed."[44]

54.     Thereafter, in October 2021, Congresswomen Jaime Herrera Beutler, a Republican Congresswoman from Washington, expressed her support for the PUMP Act, stating:

> Making sure moms can pump at work promotes healthier families, and it's also important to help businesses recruit and retain the workforces they need. That's why I'm pleased the House approved this business-friendly, bipartisan legislation … that simply provides moms with reasonable opportunities to pump in their workplace. I'm

---

[42] In one of a handful of cases in which the court permitted a § 207(r) claim to proceed, a postpartum bank teller was told she had to express milk in the bathroom. When she objected on the basis that the bathroom was unsanitary, she was eventually forced to leave work in the middle of the day to go home and pump. She sued her employer, and the court only permitted the suit to proceed because it found the plaintiff had alleged 40.35 hours of lost wages. The case was settled in 2017. *Lico v. TD Bank,* No. 14-cv-4729, 2015 U.S. Dist. LEXIS 70978 (E.D.N.Y., 2015).

[43] *Salz v. Casey's Marketing Co.*, No. 11-cv-3055, 2012 U.S. Dist. LEXIS 100399, at *7 (N.D. Iowa July 19, 2012).

[44] https://www.whitehouse.gov/briefing-room/statements-releases/2021/03/08/statement-by-president-biden-on-international-womens-day/ (last accessed October 1, 2023).

proud to have worked with businesses, health care stakeholders, and parents in successfully leading this legislation[.][45]

55.     On September 27, 2021, the White House issued a statement strongly supporting the PUMP Act, stating that: No new mother should face unfair treatment in the workplace because their employer refuses to provide them with [a] . . . private, clean space needed to adequately express breast milk while at work, forcing them to choose between their health and the health of her child, and earning a paycheck. Yet millions of new working mothers, disproportionately working mothers of color, face this challenge every day.[46]

56.     Prior to the vote on the PUMP Act, Republican Senator Lisa Murkowski stated: "With this bill, parents will be empowered to make their own choices on breastfeeding, and businesses can improve retention of valuable employees. It's a win-win-win . . . What has been a question is a women's protection at the jobsite to pump safely. If a mother chooses to breastfeed her baby, she deserves the legal protection to do so without having to worry about it impacting her career."[47]

57.     Numerous organizations outside of government also expressed strong support for the PUMP Act. For example, in a news release published on October 22, 2021, on the U.S. Breastfeeding Committee's website, Vania Leveille, Senior Legislative Counsel for the ACLU, said: "Employers in every industry should have policies in place to accommodate the needs of pregnant and breastfeeding employees but, unfortunately, that is not currently the case. Instead,

---

[45] https://adams.house.gov/media-center/press-releases/adams-maloney-congressional-maternity-care-caucus-black-maternal-0 (last accessed October 1, 2023).

[46] https://www.whitehouse.gov/wp-content/uploads/2021/09/H.R.-3110-SAP.pdf (last accessed October 1, 2023).

[47] https://www.newsweek.com/full-list-senators-who-voted-against-breastfeeding-workers-protections-1769450 (last accessed October 1, 2023).

too many workers are penalized, discriminated against, terminated, or left without options when they try to pump breast milk at work."[48]

58.     On the other hand, organizations that represent businesses also saw the value in passing the PUMP Act. The National Retail Federation's Senior Vice President for Government Relations told the Members of the House in a letter dated October 12, 2021, that "[t]he PUMP Act is a sound piece of bipartisan legislation that will allow nursing mothers to maintain their vital role the American workplace."[49]

59.     Similarly, in a letter sent to all the Members of Congress, the U.S. Chamber of Commerce, stated: "The PUMP Act is a win-win for nursing mothers and the businesses that employ them. Employers would get clarity and a way to avoid litigation, and nursing mothers would be able to remain in the workforce. The Chamber is pleased to strongly support this legislation."[50]

60.     Indeed, private industry also recognizes and supports the increasing need to protect and accommodate nursing mothers. There is a growing industry for the sale of "portable lactation pods," which are specially designed private spaces available to be used in various public and private venues to support breastfeeding mothers.[51] These pods are intended to address the need for

---

[48] https://www.usbreastfeeding.org/usbc-news--blogs/pump-for-nursing-mothers-act-passes-with-bipartisan-support-in-us-house-of-representatives (last accessed October 1, 2023).

[49] Letter from David French to the Honorable Nancy Pelosi (Oct. 12, 2021) *available at* http://d22f3d5c92fe72fd8ca1-d54e62f2f7fc3e2ff1881e7f0cef284e.r22.cf1.rackcdn.com/2021%20Hill%20Letters/NRF%20Support%20Letter%20-%20PUMP%20Act%20-%20October%2012%202021.pdf (last accessed October 1, 2023).

[50] *U.S. Chamber Letter on the PUMP Act* (Dec. 20, 2022) *available at* https://www.uschamber.com/employment-law/u-s-chamber-letter-on-the-pump-act (last accessed October 1, 2023).

[51] For example, Mamava Inc., BrighterBooth, Nessel, and Panel Built Incorporated all market and sell portable, free-standing, and/or prefabricated lactation spaces.

access to adequate space for breastfeeding, away from public spaces or unhygienic restrooms. The growing presence of these lactation pods in the United States highlights a societal effort to recognize the importance of the well-being of both new mothers and infants.

### E. The PUMP Act

61. Given the acknowledged problems with the Pumping at Work Act, in late 2022, Congress passed the PUMP Act with strong bi-partisan majorities in both houses. In the House of Representatives, it passed with a 276-member majority,[52] and in the Senate, it passed with a near-unanimous vote of 92 to 5.[53]

62. On December 29, 2022, the President signed an omnibus spending bill (P.L. 117-58), which included the PUMP Act.

63. According to both the House bill (H.R. 3110)[54] and the relevant Senate Amendment (S. Amdt. 6595),[55] the purpose of the PUMP Act was "[t]o amend the [FLSA] to expand access to breastfeeding accommodations in the workplace, and for other purposes."

64. Specifically, the PUMP Act amended the FLSA to include § 218d, which provides that:

> (a) An employer shall provide —
>
> ''(1) a reasonable break time for an employee to express breast milk for such employee's nursing child for 1 year after the child's birth each time such employee has need to express the milk; and

---

[52] https://clerk.house.gov/Votes/2021331?BillNum=3110 (last accessed October 1, 2023).

[53] https://www.senate.gov/legislative/LIS/roll_call_votes/vote1172/vote_117_2_00417.htm (last accessed May 11, 2023).

[54] https://www.congress.gov/bill/117th-congress/house-bill/3110/text (last accessed October 1, 2023).

[55] https://www.congress.gov/amendment/117th-congress/senate-amendment/6595 (last accessed October 1, 2023).

> ''(2) a place, other than a bathroom, that is shielded from view and free from intrusion from coworkers and the public, which may be used by an employee to express breast milk.

29 U.S.C. § 218d.

65.    Notably, the statute states that the "employer ***shall*** . . . provide a place…" for nursing parents to express milk. (Emphasis added.) The word "shall" in § 218d imposes an affirmative duty on the employer to provide a clean, secure space because, as Congress found, "[a] private space to express breast milk is critical for nursing employees."[56]

66.    Notably, the PUMP Act also strengthened the relief available by inserting specific language in § 216(b) (one of the enforcement sections of the FLSA) stating that:

> Any employer who violates the provisions of section 15(a)(3) ***or 18D of this Act*** [29 USCS § 215(a)(3) or 218d] ***shall be liable for such legal or equitable relief as may be appropriate*** to effectuate the purposes of section 15(a)(3) or 18D [29 USCS § 215(a)(3) ***or 218d***], including without limitation employment, reinstatement, promotion, and the payment of wages lost and an additional equal amount as liquidated damages.

29 U.S.C. § 216(b) (emphasis added, which reflects the amendments to § 216(b)).

67.    Congress intended this addition to correct for the lack of enforcement provided for in the Pumping at Work Act. According to the legislative intent behind the PUMP Act, one of the purposes was to provide additional forms of relief:

> …recovery only for unpaid minimum wages or overtime compensation renders employees unable to enforce current break time and space requirements in a private right of action…even if unpaid minimum wage or overtime compensation were recoverable, lost wages are often an inadequate or inappropriate form of relief… H.R. 3110 would allow workers to seek legal ***and equitable relief***… Allowing for legal and equitable relief under H.R. 3110 will also ***allow nursing employees to recover for harm to their physical and***

---

[56] H.R. 3110, 117th Cong. (1st Sess. 2021), at 10.

21

> *mental health…including for medical costs or emotional distress,*
> *and punitive damages for this type of harm*.[57]

**F.    Guidance from the Department of Labor**

68.    On May 17, 2023, The U.S. Department of Labor Wage and Hour Division ("WHD") published Field Assistance Bulletin No. 2023-02 (the "FAB"), which provides guidance to agency officials responsible for enforcing the PUMP Act.[58] The FAB provides insight into how the WHD will enforce employees' rights under the PUMP Act.

69.    Regarding an employee's right to breaks to pump breast milk, the FAB emphasizes that employees are entitled to a "reasonable break *each time* such employee has need to pump breast milk at work for one year after the child's birth. An employer may not deny a covered employee a needed break to pump."[59]

70.    Regarding the space requirements, employers must provide a "functional space" that is "(1) shielded from view; (2) free from intrusion from coworkers and the public; (3) available each time it is needed by the employee; *and* (4) not a bathroom."[60]

71.    The FAB states: The location *must be functional as a space for pumping*.[61] It must have a place for the nursing employee to sit, a flat surface (other than the floor), and employees must be able to store milk while at work.[62]

---

[57] H.R. 3110, 117th Cong. (1st Sess. 2021), at 16 (emphasis added).

[58] U.S. Department of Labor, Wage and Hour Division, Field Assistance Bulletin No. 2023-02. Available at: https://www.dol.gov/sites/dolgov/files/WHD/fab/2023-2.pdf (last accessed October 1, 2023).

[59] *Id.* at 2 (emphasis in original).

[60] *Id.* at 4 (emphasis in original).

[61] *Id.* (emphasis added).

[62] *Id.*

72.     Further, an employer who violates a nursing mother's right to reasonable break times and a functional space to pump breast milk is liable "for appropriate legal or equitable remedies . . . . [which] may include **compensatory damages and make-whole relief**, such as economic losses that resulted from violations, **and punitive damages** where appropriate. These remedies are available regardless of whether the employee has also experienced retaliation."[63]

73.     An employee may file a private cause of action seeking appropriate remedies, and there is "**no waiting time**" for an employee bringing a private suit "to enforce the reasonable break time requirement."[64]

74.     Finally, employers are required to "post and keep posted a notice explaining the FLSA [and PUMP Act provisions] in conspicuous places in every establishment where such employees are employed."[65]

75.     On September 18, 2023, the Department of Labor's Wage and Hour Division found "supervisors employed by Aimbridge Employee Service Corp. — operating as Hammock Beach Golf Resort and Spa — failed to provide a private place for a worker to express milk for her newborn baby, in violation of" the PUMP Act.[66] The agency found that it took supervisors nearly four months to provide an employee with a suitable space to pump milk, and even then the space — a manager's office — lacked privacy as the employee learned "when another worker entered the room while the mother was attempting to pump milk."

---

[63] *Id.* at 7 (emphasis added).

[64] *Id.* at 8 (emphasis in original).

[65] *Id.*

[66] *U.S. Department of Labor Finds Palm Coast Resort Operator Denied Employee Private Space to Express Milk for Newborn, As Federal Law Requires*. Available at: https://www.dol.gov/newsroom/releases/whd/whd20230918 (last accessed September 22, 2023).

76. Division Director Wildalí De Jesús stated: Employers who fail to provide break time and a private place as the law requires are creating a barrier for women to balance their career and a child's needs once they return to work after having a child."[67] "There are long term benefits to breast feeding both for families and employers. Mothers who breast feed generally take less time off work due to childhood illnesses," added De Jesús.

77. Plaintiff seeks this Court's assistance on behalf of all nursing mothers who work and their infant children to improve breastfeeding outcomes by making clear that employers cannot deny their employees adequate lactation accommodation in the workplace.

## V. DEFENDANTS DENY PLAINTIFF AND SIMILARLY SITUATED EMPLOYEES THIER RIGHTS TO ACCOMMODATION

78. Plaintiff Bazzett began working for YCD and The Wendy's Defendants ("YCD Defendants") in August 2022 as a Crew Member at the Wendy's restaurant located at 100 Florida Road in Adel, Georgia.

79. In March 2023, Ms. Bazzett gave birth to her child. She took a few months off work and returned to work in or about June 2023. However, when Ms. Bazzett returned, YCD Defendants did not accommodate her request to pump breast milk at work.

80. Before Ms. Bazzett returned to work, she spoke with the branch manager, "Lori" who told her that she would have breaks every three to four hours and could pump in the bathroom. When Ms. Bazzett returned to work, however, she refused to pump in the bathroom because it was unsanitary. Ms. Bazzett notified her shift lead that she was not going to pump in the bathroom because it was unsanitary. Instead, she used the "Crew Room" to pump and used an apron to cover herself. Ms. Bazzett quickly realized that the Crew Room was not sanitary or functional to pump

---

[67] Id.

milk in because it was adjacent to the Restaurant's back door, where Crew Members took out the trash and broke down boxes. Also, the Crew Room doubled as a storage room and break room, and there was a safe; other Crew Members frequently came in and out while Ms. Bazzett was pumping. Because there was no secure or private place for Ms. Bazzett to pump, she continued using the Crew Room.

81.    Lori was aware that Ms. Bazzett was pumping in the Crew Room. On one occasion, Lori heard Ms. Bazzett's pump while she was pumping in the Crew Room and entered to find Ms. Bazzett pumping there. Lori simply commented about how loud the noise was from the pump and then walked off.

82.    YCD Defendants also failed to provide Ms. Bazzett with breaks each time she needed to pump. On several occasions, when the Restaurant was short-staffed, she was not permitted to take a break and went five to six hours without the opportunity to pump. Ms. Bazzett purchased a wearable pump with the hopes that she could pump and continue working. However, the wearable pump was ineffective, and Ms. Bazzett could only pump successfully during her lunch break in her car. She kept pumping in her car for several months before ending her employment with YCD Defendants in September 2023.

83.    YCD Defendants' lack of pumping accommodation impacted Ms. Bazzett both physically and mentally. She experienced a significant reduction in her milk supply, which caused her great distress. Ms. Bazzett planned on producing enough milk for her child and was aggravated and stressed that she could not do so. She does not trust formulas for her child but had to supplement her feeding with formula. Ms. Bazzett also felt humiliated when she had to pump milk in the Crew Room because other employees would constantly walk in and out. She further felt

stressed each time she requested a break to pump because her managers responded rudely and unsympathetically.

84.     YCD Defendants did not provide Ms. Bazzett with sufficient break times "each time" she needed to pump. There were days that Ms. Bazzett did not get to take any breaks at all to pump, and her supervisors refused to take action or set up processes to ensure she was receiving the accommodation to which she was entitled. For example, YCD Defendants could have re-arranged staffing for the limited time while Ms. Bazzett was pumping to ensure adequate coverage to allow Ms. Bazzett to take pumping breaks, but they chose not to. Nor did those supervisors provide Ms. Bazzett with a "functional space" to express breast milk. Again, YCD Defendants could have set up a temporary pumping space for Ms. Bazzett but chose not to. In all these ways, YCD Defendants violated the PUMP Act with regard to Ms. Bazzett.

85.     Thus, YCD Defendants, on information and belief pursuant to organization-wide policies (or lack thereof), did not provide Ms. Bazzett with sufficient break times "each time" she needed to pump. Nor did they provide her with a functional, sanitary, and private space to pump. Defendants' acts violate the PUMP Act.

86.     Upon information and belief, pursuant to organization-wide policies (or lack thereof), ABC Corporations 1-217 failed to provide their employees with sufficient break times "each time" they needed to pump.

87.     Upon information and belief, again pursuant to organization-wide policies (or lack thereof), ABC Corporations 1-217 also failed to provide their employees with functional, sanitary, and private spaces to pump.

88.     Upon information and belief, the foregoing policies (or lack thereof) were created, coordinated, and/or managed by employees and executives at the Wendy's Defendants. The

Wendy's Defendants' actions regarding the franchisees were accomplished through various means, including but not limited to contractual clauses giving Wendy's Defendants control over: the franchisees' operations, including staffing and hours of operation; companywide policies or decisions not to implement companywide policies regarding breast feeding; regular field visits to coordinate and enforce compliance with such policies; and/or through a failure to adequately train franchisee owners and managers regarding the rights of breast-feeding employees.

89. The foregoing acts of ABC Corporations 1-217 violate the PUMP Act.

90. In accordance with 29 C.F.R. § 516.4, Defendants should have alerted nursing employees like Ms. Bazzett of their rights to sufficient lactation accommodation by posting information in conspicuous locations at Wendy's restaurants across the country. Upon information and belief, Defendants did not make such information available to ensure that employees were aware of their rights to take reasonable breaks and to have a secure place to pump.

91. As Plaintiff's experience shows, in practice Defendants do not provide accommodations for nursing mothers. Defendants do not have an adequate or specific method or policy regarding secure, private, functional spaces for nursing mothers that they enforce at their locations. Defendants' failure to provide accommodations for nursing mothers violates the law. The FLSA requires employers to provide reasonable accommodations for nursing mothers, such as break times and a private place to pump breast milk. Defendants' refusal to do so denies nursing mothers their legal rights, makes it difficult for them to continue working while breastfeeding, and has impacted them mentally and physically.

92. Defendants' failure to provide Ms. Bazzett and other similarly situated employees with reasonable breaks and a secure space, shielded from view, to express milk, caused personal anguish, anxiety, and uncertainty about their ability to continue breastfeeding. Returning to work

27

after having a baby and continuing to pump during working hours requires mothers to have stamina and persistence. It requires the upkeep of fluids and nutrition to ensure a continuous flow of milk production. Sufficient time and a functional space are necessary because to begin the flow of milk, mothers must be in a relaxed and rested state, not stressed and anxious while pumping in the bathroom or in their personal vehicles in the public parking lots, in plain view. The stress and anxiety of breastfeeding while being seen by the public or colleagues, and fear of not having enough time to pump until empty, can jeopardize the flow of milk and may result in mothers not being able to express as quickly as someone who is relaxed and certain that they will not be intruded upon.[68]

93. Ms. Bazzett was damaged in that she experienced embarrassment, personal anguish, personal hardship, anxiety, humiliation, and emotional distress.

## VI. COLLECTIVE ACTION ALLEGATIONS

94. The Wendy's Collective consists of all persons who have been or currently are employed by the Wendy's Defendants at a Wendy's restaurant across the country, since December 29, 2022, who (1) were or are lactating (2) were or are non-exempt employees, and (a) were or not provided with breaks "as needed" to pump or (b) were or are not provided with a sanitary "functional space," that is (i) free from intrusion, (ii) shielded from view, (iii) available each time it is needed, and (iv) not a bathroom in the year following the birth of the child.

95. The Wendy's Franchisee Collective consists of all persons who have been or currently are employed by the Wendy's Franchisee Defendants at a Wendy's restaurant since

---

[68] *See* H.R. 3110, 117th Cong. (1st Sess. 2021), at 10 ("Breastfeeding mothers must feel safe in order to let down breast milk, and a reasonable guarantee of privacy is a key part of that safety. If a nursing mother feels unsafe or emotionally distressed, her production of oxytocin may be inhibited, which can create a physiological barrier to lactation." (citation omitted)).

December 29, 2022, who (1) were or are lactating (2) were or are non-exempt employees, and (a) were or not provided with breaks "as needed" to pump or (b) were or are not provided with a sanitary "functional space," that is (i) free from intrusion, (ii) shielded from view, (iii) available each time it is needed, and (iv) not a bathroom in the year following the birth of the child.

96.     As of January 1, 2023, there were 5,994 Wendy's restaurants in operation in the U.S. There are over 14,000 full-time and part-time Wendy's employees, with over 50% of them being female. There are similarly situated employees who are working or worked at Wendy's restaurants and are or were unlawfully denied their rights under the PUMP Act.

97.     The number of affected employees can be ascertained by Defendants based on their payroll and personnel records. Members of the Collectives may be informed of the pendency of this collective action by direct mail and/or publication at the various Wendy's locations throughout the country.

98.     This action is properly maintained as a collective action under 29 U.S.C. § 216(b) because all class members are similarly situated. The affected individuals were and continue to be female employees working at Wendy's branded restaurants who: (1) required accommodations for lactation at work from December 29, 2022, to the present; (2) work or worked as employees at Wendy's restaurants; (3) informed their employer that they needed lactation accommodations at work; (4) and were not provided with reasonable breaks or a secure, private, non-bathroom space within which to pump.

99.     As mentioned above, companies such as Wendy's can accommodate nursing employees by purchasing portable spaces, additional examples of which are shown below. These portable lactation pods are available at various prices and sizes and can be stored off-site. They are marketed to provide a secure, sanitary space with a flat surface to comfortably accommodate all

nursing mothers. This is a widely available and simple solution for Defendants to accommodate their lactating employees.

 

100. Defendants could also have accommodated their nursing employees by providing them access to clean offices and by installing locks on the doors to ensure they were secure. However, Defendants chose not to do so.

101. Defendants failed to train or adequately inform their employees about the rights of nursing mothers to take reasonable breaks to pump and their rights to a secure, private, non-bathroom space. Defendants failed to institute procedures or guidelines to ensure that nursing employees would be properly accommodated.

102. Defendants' willful policies and practices denied and continue to deny members of the Collectives their rights under the PUMP Act. Defendants' actions were willful because the PUMP Act received substantial publicity at the time of its passage and thereafter. The legal obligation to provide nursing employees with reasonable breaks and secure spaces has been in effect since 2010. The Wendy's Defendants have career employment attorneys and an in-house legal team whose job requires staying current with recent laws and regulations and their potential impact on Wendy's operations. Therefore, the Wendy's Defendants knew or should have known about its obligation to provide lactation accommodations to its employees and through their strong oversight program should have informed all its franchisees of the same obligations. "Franchised

restaurants are required to be operated under uniform operating standards . . . ." Defendants "monitor[] franchisee operations and inspect[] restaurants periodically to ensure that required practices and procedures are being followed."[69] Wendy's restaurants are also required to operate a physical space that complies with ". . . prototypical plans and specifications for the construction of a standard Wendy's restaurant and for the exterior and interior design and layout, fixtures, furnishings, equipment, and signs. Franchisee shall adapt . . . the prototypical plans and specifications to the Approved Location, subject to Franchisor's approval . . . ."[70] Defendants had notice of their non-compliance and, by failing to act, willfully refused to provide sufficient accommodation.

103.    Similarly, the Wendy's Franchisee Defendants knew or should have known about their obligation to provide lactation accommodations to their employees, either through monitoring and understanding their obligations as employers themselves, or through trainings and coordination provided by the Wendy's Defendants.

104.    Wendy's boasts about being on the Forbes World's Best Employers 2022 list and claims it is "committed to providing our employees with safe and comfortable work environments. . . ."[71] However, failing to provide lactation accommodations to nursing employees who repeatedly request it and forcing them to continue working while they pump in unsanitary spaces falls far short of creating a safe and comfortable environment for employees. Instead, it results in the unlawful denial of employees' rights under the PUMP Act.

---

[69] *See* Wendy's, Annual Report, Year ending January 2, 2022, at 12. Available at: https://d18rn0p25nwr6d.cloudfront.net/CIK-0000030697/6483abe6-765e-4052-a4a0-6b3b01480410.pdf (last accessed October 4, 2023).

[70] *See* Quality Is Our Recipe, LLC Unit Franchise Agreement, § 3.2, at 5.

[71] *Id.*, at 14.

**FIRST COUNT**

**Violation of the FLSA and PUMP Act**
**[29 U.S.C. § 218d(a)(1)]**
**(Brought on Behalf of Plaintiff and Members of the Wendy's Collective and the Wendy's**
**Franchisee Collective)**

105.     Paragraphs 1 – 104 are incorporated by reference as though fully set forth at length herein.

106.     Plaintiff and members of the Wendy's Collective and Wendy's Franchisee Collective are similarly situated individuals within the meaning of the FLSA, 29 U.S.C. § 216(b).

107.     The FLSA, at 29 U.S.C. § 218d(a)(1), states that an "employer shall provide: (1) a reasonable break time for an employee to express breast milk for such employee's nursing child for 1 year after the child's birth each time such employee has need to express the milk . . . ."

108.     Throughout the relevant period, the Wendy's Defendants exercised control, directly or indirectly, over the employees and operations of the Wendy's Franchisee Defendants. The Wendy's Defendants exercise control, directly or indirectly, over the working conditions at The Wendy's Franchisee Defendants' restaurants that relate to safety and health of employees – specifically, lactation accommodations. They do so through their control over the specifications governing the physical space for the franchised restaurant and through their establishment, coordination, and training regarding employee and operational policies.

109.     According to Wendy's 2022 Annual Report, "Wendy's strives to maintain quality and uniformity throughout all restaurants by . . . continual in-service training of employees, restaurant operational audits and field visits from Wendy's supervisors. In the case of franchisees, field visits are made by Wendy's personnel who review operations . . . and make recommendations to assist in compliance with Wendy's specifications."[72]

---

[72] *Id.*, at 8.

110. The Annual Report further provides that "[f]ranchised restaurants are required to be operated under uniform operating standards," "[e]ach year, Wendy's representatives conduct unannounced inspections of all company and franchise restaurants to test conformance to our . . . operational requirements," and "Wendy's monitors franchisee operations and inspects restaurants periodically to ensure that required practices and procedures are being followed."[73]

111. Wendy's franchisees "are contractually obligated to operate their restaurants in accordance with the standards set forth in our franchise and other agreements with them."[74]

112. Upon information and belief, however, the Wendys' Franchise Defendants may make a written request to deviate from the Operating Manual and, therefore, could have sought relief from the uniform operating standards to make appropriate lactation accommodations to its employees.

113. In addition, both the Wendy's Defendants and the Wendy's Franchisee Defendants share or co-determine employee hours of work. For example, the Wendy's Defendants Unit Franchise Agreement provides, at Sections 6.6 and 6.7 as set forth below, that franchisees must keep the hours specified in the referenced Manual and must maintain adequate staff as specified in the Operating Manual, or as requested by the Franchisor in writing.

114. As such, the Wendy's Franchisee Defendants also could have provided their employees with lactation accommodations by seeking from The Wendy's Defendants additional staffing or breaks beyond that specified in the Operating Manual to allow for lactation accommodations for their employees.

---

[73] *Id.*, at 12

[74] *Id.*, at 20.

115.    The Wendy's Defendants entered a standard Wendy's Unit Franchise Agreement with the Wendy's Franchisee Defendants. The standard Unit Franchise Agreement, demonstrating the extent to which the Wendy's Defendants control the operations and, in certain instances, employees, of its franchisees, states:

> WHEREAS, Franchisee understands and acknowledges the importance of Franchisor's high standards . . . and the necessity of operating the business franchised hereunder in conformity with Franchisor's standards and specifications . . . .
>
> 3.1.    [F]ranchisor shall make available to Franchisee . . . and Franchisee's initial management employees and restaurant crew (as such personnel positions are defined in the Manual), an initial training program . . . . If, however, Franchisee . . . has . . . another restaurant operating under the System, Franchisee shall be required to provide an initial training program . . . in accordance with Franchisor's specifications, and subject to Franchisor's review and approval of such training.
>
> 3.2    Franchisor shall make available . . . prototypical plans and specifications for the construction of a standard Wendy's restaurant and for the exterior and interior design and layout, fixtures, furnishings, equipment, and signs. Franchisee shall adapt . . . the prototypical plans and specifications to the Approved Location, subject to Franchisor's approval . . . .
>
> 3.3    Franchisor shall conduct, as it deems advisable, periodic inspections of the Restaurant and the Restaurant premises during the period of construction and improvement to determine whether Franchisee is complying with the approved plans and specifications for the Restaurant.
>
> 3.4    Franchisor shall inspect and approve the Restaurant for opening prior to the opening of the Restaurant. Franchisee shall not commence operation of the Restaurant until receiving such approval from Franchisor.
>
> 3.6.    Franchisor shall provide Franchisee, on loan, one copy of the Manual. The Manual shall be deemed to include a multi-volume manual describing Franchisor's operating standards, as well as bulletins, updates, revisions, policy statements and amendments thereto, which may be issued by Franchisor from time to time.

     \*  \*  \*

3.8. Franchisor shall conduct . . . periodic inspections of the Restaurant, and evaluations of the products sold and services rendered by the Franchised Business.

3.9. Franchisor shall provide . . . periodic and continuing advisory assistance to Franchisee as to the operation . . . of the Restaurant.

     \*  \*  \*

6.2. An individual designated by the Franchisee (the "Operator") shall supervise the operation of the Restaurant . . . . The Operator and any replacement Operator shall be first approved by the Franchisor, and shall demonstrate to Franchisor's satisfaction (at the time of approval and on a continuing basis) that he satisfies Franchisor's educational, managerial, and business standards, and has the aptitude and ability to conduct, operate, and supervise the Franchised Business.

6.3. Prior to the opening of the Restaurant, Franchisee . . . and Franchisee's initial management employees and restaurant crew shall attend and successfully complete, to Franchisor's satisfaction, the training program or programs offered by Franchisor. Any management persons subsequently employed by Franchisee shall also attend such training programs as required by Franchisor. Franchisee and Franchisee's management employees involved in the operation of the Restaurant shall also attend such refresher courses, seminars, and other training programs as Franchisor may reasonably require from time to time.

6.6. Franchisee shall . . . keep the business open and in normal operation for such hours and days as Franchisor may from time to time specify in the Manual or as Franchisor may otherwise approve in writing . . . .

6.7. Franchisee agrees to maintain . . . staff in sufficient numbers as required by Franchisor . . . .

6.9 Franchisee shall at all times maintain the Restaurant in a high degree of sanitation, repair, and condition, and in connection therewith shall make such additions, alterations, repairs, and replacements thereto as may be required for that purpose (but no others without Franchisor's prior written consent), including, without limitation, such periodic repainting or replacement of signs,

furnishings, equipment, and decor as Franchisor may reasonably direct.

6.10 At Franchisor's request . . . Franchisee shall refurbish the Restaurant . . . to conform to the building design, trade dress, color schemes, and presentation . . . in a manner consistent with the image then in effect for new restaurants under the System, including, without limitation, remodeling, redecoration, structural changes, and modifications to existing improvements and equipment.

6.11 . . . Franchisee shall operate the Restaurant in strict conformity with such methods, standards, and specifications as Franchisor may from time to time prescribe in the Manual or otherwise in writing. Franchisee agrees:

6.11.C To purchase and install, at Franchisee's expense, all fixtures, furnishings, equipment, decor, and signs as Franchisor shall specify; and to refrain from installing or permitting to be installed on or about the Restaurant premises, without Franchisor's prior written consent, any fixtures, furnishings, equipment, decor, signs, or other items not previously approved by Franchisor in writing;

*      *      *

6.17 Franchisee shall implement and adhere to all changes, additions, and refinements in the System, as may be prescribed by Franchisor from time to time, including, without limitation, the providing of new or different products or services at or from the Restaurant. Franchisee shall promptly undertake all action and make such expenditures as are necessary to implement such changes, including, without limitation, acquiring and installing new equipment, modifying leasehold improvements at the Restaurant, and hiring and training additional personnel.

8.1. [F]ranchisee shall conduct its business in accordance with the Manual . . . .[75]

116. Wendy's employees, across the country, are required to sign "Wendy's" policy documents, authored by the Wendy's Defendants, that contain rules and regulations to which employees must adhere. In addition to requiring Wendy's employees to sign Wendy's policy

---

[75] *See* Unit Franchise Agreement, *supra* n. 69, at 1–15.

documents, the Wendy's Defendants also provide training to franchisees on implementing these policies. In turn, Franchisees are required to participate in those training programs and to implement those policies.

117. Section 3.1 of the Unit Franchise Agreement requires that employees at Wendy's restaurants undergo training programs and refresher courses "subject to Franchisor's review and approval of such training." The training programs, which the Wendy's Defendants dictate and control, are for management employees and restaurant crew. Before a franchisee can open and operate a Wendy's restaurant, the Wendy's Defendants require that all staff be trained to their specifications and standards. Further, the Wendy's Defendants provide "reporting forms" for the franchisee and bookkeeping systems.

118. Section 6.11 of the Unit Franchise Agreement states that a "Franchisee shall operate the Restaurant in strict conformity with such methods, standards and specifications" in the Manual. The Manual contains a "Quality Assurance" section discussing the practices surrounding employees' "Personal Hygiene," "Restrooms," Miscellaneous Storage Facilities," and "Office Guidelines." Indeed, under Section 6.6 of the Manual, the Wendy's Defendants even control the days and times a franchisee can operate the restaurant. The Wendy's Franchisee Defendants may seek relief from the Operating Manual's provisions over operating hours with written approval from the Wendy's Defendants.

119. The Wendy's Defendants exercised control, directly or indirectly, over The Wendy's Franchisee Defendants, and their employees, and as such could have implemented policies and/or practices that require the Wendy's Franchisee Defendants to comply with the PUMP Act. For example, the Wendy's Defendants could have included in their Unit Franchise Agreement physical specifications for their restaurants that include appropriate and compliant

spaces for lactating employees. Similarly, the Wendy's Defendants could have included in their training manuals policies regarding break time accommodations for their employees.

120. Similarly, upon information and belief, the Wendy's Franchisee Defendants have also ignored their obligations under the PUMP Act through their failure to provide appropriate breaks for lactating employees. For example, the Wendy's Franchisee Defendants could have sought permission to deviate from the Operating Manual with respect to the mandating operating hours or could have established or sought to establish a policy regarding breaks for lactating employees.

121. In violation of the PUMP Act, Defendants, throughout the relevant period, failed to provide reasonable break times for employees "to express breast milk for 1 year after the child's birth each time such employee needed to express milk. . . ." 29 U.S.C. § 218d(a)(2).

122. The Wendy's Defendants had over ten years to update the Manual to include training and procedural information detailing processes and guidelines for ensuring nursing employees had sufficient time and private, sanitary spaces to pump while working. The Wendy's Defendants could have initiated "periodic and continuing advisory assistance" regarding nursing employees to assist franchisees in lactation accommodation. Indeed, the Manual is "designed to change as Wendy's changes to meet the challenges of the future."[76] The Wendy's Defendants repeatedly chose not to update the Manual to provide a detailed procedure or guidelines for accommodating nursing employees.

---

[76] Notice, Wendy's Operations Standards Manual 2022. Available at: https://www.franchimp.com/?page=pdf&f=107514_2023.pdf (last accessed October 4, 2023).

123.     Similarly, the Wendys' Franchisee Defendants could have made efforts to ensure that nursing employees had sufficient time to pump while working by creating and/or by modifying its existing break policies to ensure employees had adequate time to pump as needed.

124.     Defendants knowingly, willfully, and systematically engaged in this unlawful practice of refusing to provide reasonable breaks to express breast milk to Plaintiff and those similarly situated in violation of the PUMP Act.

125.     Plaintiff will request that the Court authorize notice to all women who have been or currently are employed by Defendants at a Wendy's restaurant across the country, which is owned by the Wendy's Defendants or a franchisee, since January 1, 2022, who took leave from work under the Family and Medical Leave Act ("FMLA") to inform them of the pendency of this action and their right to "opt-in" to this lawsuit pursuant to 29 U.S.C. § 216(b) for the purpose of seeking damages, attorneys' fees, litigation costs, declaratory and injunctive relief, and all other relief available.

126.     Defendants violated the rights of Plaintiff and members of the Wendy's Collective and Wendy's Franchisee Collectives under the PUMP Act by failing to provide reasonable break times to express breast milk.

127.     Defendants violated the rights of Plaintiff and members of the Wendy's Collective and Wendy's Franchisee Collectives by failing to institute policies and practices that comply with the PUMP Act.

128.     Defendants are liable to Plaintiff and members of the Wendy's Collective and Wendy's Franchisee Collective for legal and equitable relief in the form of damages and other relief pursuant to 29 U.S.C. § 216(b), as well as reasonable attorneys' fees, costs, and expenses. *See* 29 U.S.C. § 216(b).

## SECOND COUNT

**Violation of the FLSA and PUMP Act**
**[29 U.S.C. § 218d(a)(2)]**
**(Brought on Behalf of Plaintiff and Members of the Wendy's Collective and the Wendy's Franchisee Collective)**

129.    Paragraphs 1 through 128 herein are re-alleged and incorporated by reference into this Second Count.

130.    Plaintiff and the members of the Wendy's Collective and Wendy's Franchisee Collective are similarly situated individuals within the meaning of the FLSA, 29 U.S.C. § 216(b).

131.    The FLSA, at 29 U.S.C. § 218d(a)(2), states that an "employer shall provide: . . . (2) a place, other than a bathroom, that is shielded from view and free from intrusion from coworkers and the public, which may be used by an employee to express breast milk."

132.    According to Wendy's 2022 Annual Report, "Wendy's strives to maintain quality and uniformity throughout all restaurants by . . . continual in-service training of employees, restaurant operational audits and field visits from Wendy's supervisors. In the case of franchisees, field visits are made by Wendy's personnel who review operations . . . and make recommendations to assist in compliance with Wendy's specifications."[77]

133.    The Annual Report further provides that "[f]ranchised restaurants are required to be operated under uniform operating standards," "[e]ach year, Wendy's representatives conduct unannounced inspections of all company and franchise restaurants to test conformance to our . . . operational requirements," and "Wendy's monitors franchisee operations and inspects restaurants periodically to ensure that required practices and procedures are being followed."[78]

---

[77] *Id.*, at 8.

[78] *Id.*, at 12

40

134. Wendy's franchisees "are contractually obligated to operate their restaurants in accordance with the standards set forth in our franchise and other agreements with them."[79]

135. Upon information and belief, the Wendys' Franchise Defendants may make a written request to deviate from the Operating Manual and, therefore, could have sought relief from the uniform operating standards to make appropriate lactation accommodations to its employees.

136. Wendy's employees, across the country, are required to sign "Wendy's" policy documents, authored by the Wendy's Defendants, that contain rules and regulations to which employees must adhere. In addition to requiring Wendy's employees to sign Wendy's policy documents, the Wendy's Defendants also provide training to franchisees on implementing these policies. In turn, Franchisees are required to participate in those training programs and to implement those policies.

137. Section 3.1 of the Unit Franchise Agreement requires that employees at Wendy's restaurants undergo training programs and refresher courses "subject to Franchisor's review and approval of such training." The training programs, which the Wendy's Defendants dictate and control, are for management employees and restaurant crew. Before a franchisee can open and operate a Wendy's restaurant, the Wendy's Defendants require that all staff be trained to their specifications and standards. Further, the Wendy's Defendants provide "reporting forms" for the franchisee and bookkeeping systems.

138. Section 6.11 of the Unit Franchise Agreement states that a "Franchisee shall operate the Restaurant in strict conformity with such methods, standards and specifications" in the Manual. The Manual contains a "Quality Assurance" section discussing the practices surrounding employees' "Personal Hygiene," "Restrooms," Miscellaneous Storage Facilities," and "Office

---

[79] *Id.*, at 20.

Guidelines." Indeed, under Section 6.6 of the Manual, the Wendy's Defendants even control the days and times a franchisee can operate the restaurant. The Wendy's Franchisee Defendants may seek relief from the Operating Manual's provisions over operating hours with written approval from the Wendy's Defendants.

139.    Throughout the relevant period, the Wendy's Defendants exercised control, directly or indirectly, over the employees and operations of the Wendy's Franchisee Defendants. The Wendy's Defendants exercise control, directly or indirectly, over the working conditions at The Wendy's Franchisee Defendants' restaurants that relate to safety and health of employees – specifically, lactation accommodations. They do so through their control over the specifications governing the physical space for the franchised restaurant and through their establishment, coordination, and training regarding employee and operational policies.

140.    For example, the Wendy's Defendants Unit Franchise Agreement provides, at Sections 3.2 and 3.3, that franchisees must maintain a physical premises consistent with a "standard Wendy's restaurant and for the exterior and interior design and layout, fixtures, furnishings, equipment, and signs" and that the Wendy's Defendants shall conduct period inspections to confirm that franchisees are in fact doing so.

141.    Similarly, the Wendy's Defendants Unit Franchise Agreement also prohibits franchisees from installing or permitting to be installed on or about the Restaurant premises, without Franchisor's prior written consent, any fixtures, furnishings, equipment, decor, signs, or other items not previously approved by Franchisor in writing.

142.    Similarly, the Wendy's Franchisee Defendants also could have provided their employees with lactation accommodations by seeking from the Wendy's Defendants a portable

lactation space or use of a sanitary, secure space within their premises beyond that specified in the Operating Manual to allow for lactation accommodations for their employees.

143.     The Wendy's Franchisee Defendants also could have provided their employees with lactation accommodations by seeking from the Wendy's Defendants a deviation from their standard policies regarding the physical layout of the premises or the space to be utilized for lactation accommodations.

144.     In violation of the PUMP Act, Defendants, throughout the relevant period, failed to provide "a place, other than a bathroom, that is shielded from view and free from intrusion from coworkers and the public, which may be used by an employee to express breast milk." 29 U.S.C. § 218d(a)(2).

145.     Despite notification from nursing employees, Defendants failed to provide a "functional," non-bathroom space within which Plaintiff and similarly situated employees could express breast milk without worrying about being intruded upon, in violation of the FLSA.

146.     As discussed, Wendy's restaurants must "be operated under uniform operating standards." Franchisees "shall adapt . . . the prototypical plans and specifications . . . subject to Franchisor's approval. . . ." In other words, the Wendy's Defendants control the design and layout of Wendy's restaurants. The Wendy's Defendants periodically inspect the restaurants to ensure the franchisee complies with the specifications. Before a Wendy's restaurant can open and operate, the Wendy's Defendants "shall inspect and approve" the restaurant. Without their approval, Franchisees cannot operate.

147.     The Wendy's Defendants failed to incorporate pumping accommodations into their systems and building designs. As discussed further below, the Wendy's Defendants control nearly every aspect of the structural design and layout of each Wendy's restaurant. Upon information and

belief, the Wendy's Defendants' designs dictate that each restaurant must have a breakroom and a restroom for their employees because these are basic human necessities and help facilitate a productive workforce. The PUMP Act clarifies that lactation accommodations are also necessary in the workplace that employers must provide to their employees. The Wendy's Defendants failed to require their franchisees to include a space where nursing employees could pump. Under the Unit Franchise Agreement, the Wendy's Defendants can require franchisees to refurbish the restaurant, including remodeling and structural changes. The updates, which the Wendy's Defendants control and can impose on franchisees, include new signs, furnishings, equipment, and décor. Despite having over ten years to incorporate a secure, private space in each restaurant, the Wendy's Defendants chose not to include these accommodations.

148.    In addition, the Wendy's Franchisee Defendants failed to incorporate pumping accommodations in their restaurants. While the Wendy's Defendants exercise control over the structural design and layout of each Wendy's Restaurant, the Wendy's Franchisee Defendants could have accommodated its nursing employees by installing a portable lactation space of pod or by closing off a shared space accessible to all employees and making it private for use by its lactating employees by, for example, installing a lock on the doors. Upon information and belief, the Wendy's Franchisee Defendants chose, however, not to do so.

149.    Defendants knowingly, willfully, and systematically engaged in this unlawful practice of refusing to provide sufficient lactation support to Plaintiff and those similarly situated, in violation of the PUMP Act.

150.    Plaintiff will request that the Court authorize notice to all women who have been or currently are employed by Defendants at a Wendy's restaurant across the country, which is owned by the Wendy's Defendants or a franchisee, since January 1, 2022, who took leave from

work under the Family and Medical Leave Act ("FMLA") to inform them of the pendency of this action and their right to "opt-in" to this lawsuit pursuant to 29 U.S.C. § 216(b) for the purpose of seeking damages, attorneys' fees, litigation costs, declaratory and injunctive relief, and all other relief available.

151. Defendants violated the rights of Plaintiff and members of the Collectives under the PUMP Act by failing to provide an appropriate, clean, and secure place free from intrusion within which to pump breast milk.

152. Defendants violated the rights of Plaintiff and the FLSA Collective by failing to institute policies and practices that comply with the PUMP Act.

153. Defendants are liable to Plaintiff and the members of the Collectives for legal and equitable relief in the form of damages and other relief, pursuant to 29 U.S.C. § 216(b), as well as reasonable attorneys' fees, costs, and expenses. *See* 29 U.S.C. § 216(b).

**WHEREFORE**, Plaintiff prays for the following relief on behalf of herself and the members of the Collectives:

A. An Order from this Court permitting this litigation to proceed as a collective action pursuant to 29 U.S.C. § 216(b);

B. An Order from this Court ordering Defendants to post a copy of an agreed-upon and court-approved notice in a common space visible to employees at each Wendy's restaurant across the country;

C. An Order from this Court ordering Defendants to provide the undersigned with the names, addresses, email addresses, and telephone numbers of all female employees who, from January 1, 2022, to the present, have taken leave from work under the FMLA;

D. An Order from this Court ordering Defendants to send, via email or intranet platform, a copy of the agreed-upon and court-approved notice to all female employees who, from January 1, 2022, to the present, have taken leave from work under the FMLA;

E.      Adjudicating and declaring that Defendants' conduct as set forth herein and above is in violation of the FLSA;

F.      Adjudicating and declaring that Defendants violated the FLSA by failing to provide reasonable break time and private, sanitary, non-bathroom lactation spaces for nursing mothers;

G.      Declaratory and injunctive relief as necessary and appropriate, including enjoining Defendants from further violations of the FLSA;

H.      Awarding Plaintiff and members of the Collectives legal and equitable damages in an amount consistent with the FLSA;

I.      Awarding Plaintiff and members of the Collectives punitive damages;

J.      Awarding Plaintiff reasonable attorneys' fees and all costs of this action, to be paid by Defendants, in accordance with the FLSA;

K.      Awarding pre-and post-judgment interest and court costs as further allowed by law;

L.      Granting Plaintiff leave to add additional plaintiffs by motion, the filing of written opt in consent forms, or any other method approved by the Court; and

M.      Awarding any further legal or equitable relief the Court deems just, equitable, and/or appropriate.

N.      Plaintiff demands trial by jury for all claims so triable pursuant to FRCP 38;

Respectfully Submitted,

*/s/Christopher Wiest*
Christopher Wiest (OH 0077931)
Chris Wiest, Atty. At Law, PLLC
50 E. Rivercenter Blvd, Ste. 1280
Covington, Ky 41011
Tel: (513) 257-1895
E: chris@cwiestlaw.com

Lisa R. Considine (*pro hac vice* forthcoming)
Oren Faircloth (*pro hac vice* forthcoming)
Siri & Glimstad LLP
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091

46

E: lconsidine@sirillp.com
E: ofaircloth@sirillp.com
*Attorneys for Plaintiff and Members of the Collectives*